UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOANNE NEWMAN, *et al.*,

      Plaintiffs,                        Case No. 16-cv-11395
                                            Hon. Matthew F. Leitman
v.

ENCORE CAPITAL GROUP, *et al.*,

      Defendants.
_____/

## OPINION AND ORDER (1) DISMISSING SOME OF PLAINTIFFS' CLAIMS FOR LACK OF SUBJECT-MATTER JURISDICTION; AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS (ECF #20)

On April 19, 2016, Plaintiffs Joanne Newman and Saundra Ryan filed this action against Defendants Encore Capital Group, Inc., Asset Acceptance Capital Corp., Midland Funding, LLC, Karli Anne Peterson, Elizabeth M. Smith, Andrew Perry, Stephanie Carrington Pettway, and Omar Najor. In Plaintiffs' Amended Complaint, they allege that Defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. (the "FDCPA"); the Michigan Regulation of Collection Practices Act, M.C.L. § 445.251 et seq. (the "MRCPA"); and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. (the "RICO Act"). On July 1, 2016, Defendants moved under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiffs' Amended Complaint. For the reasons that

follow, some of Plaintiffs' claims are **DISMISSED** for lack of subject-matter jurisdiction. With respect to the remaining claims, Defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART** as set forth below.

## I

Plaintiffs' Amended Complaint spans 155 paragraphs over 63 pages. (*See* ECF #13.) It is repetitive, disjointed, and often difficult to follow and understand. In an effort to bring some clarity to the issues in dispute, the Court sets forth in this section (1) the parties, (2) Defendants' alleged collection practices against Michigan consumers, and (3) the manner in which Newman and Ryan allege that Defendants' practices affected them.

## A

Plaintiffs Newman and Ryan are Michigan residents. (*See* Am. Compl. at ¶¶ 12-13, ECF #13 at Pg. ID 193.) At some time prior to May 2016, they stopped making payments on debts they owed to Citibank, N.A. (*See* Newman and Ryan Declarations, ECF #13-12 at Pg. ID 400-01, attached to the Am. Compl.)

Defendant Encore is a publicly traded company. (*See* Am. Compl. at ¶3, ECF #13 at Pg. ID 190.) Encore owns subsidiaries that are in the business of purchasing and collecting delinquent consumer debts. (*See id.*) Defendants Midland and Asset Acceptance are two of those subsidiaries. (*See id.*) Defendants Smith, Perry, Pettway, and Najor (the "Defendant Attorneys") are Michigan attorneys employed

by Asset Acceptance. (*See id.* at ¶¶ 7-10, ECF #13 at Pg. ID 191-92.) They assist Asset Acceptance, Midland, and Encore in the collection of delinquent consumer debts. (*See id.*) Peterson is a notary public employed by Encore and Midland. (*See id.* at ¶71, ECF #13 at Pg. ID 218.)

**B**

Plaintiffs allege that Defendants used a number of unlawful collection practices to secure default judgments in lawsuits against Michigan consumers. (*See id.* at ¶2, ECF #13 at Pg. ID 189-90.) Defendants' alleged collection practices are easiest to understand when set forth in chronological order:

1. Midland purchases "portfolios consisting of [the] old and defaulted debt" of Michigan consumers. (*Id.* at ¶54, ECF #13 at Pg. ID 212.)[1]

2. To begin the collection process against a Michigan consumer, Midland prepares an affidavit stating that Midland owns the consumer's delinquent debt (the "Ownership and Delinquency Affidavit"). (*See id*. at ¶¶ 53, 58, 66, 81, ECF #13 at Pg. ID 212-14, 216, 224.) The Ownership and Delinquency Affidavit identifies the amount of the debt, the creditor to whom the debt was originally owed, and the last four digits of the consumer's account number with the creditor. (*See*, *e.g.*, Ownership and Delinquency Affidavit as to Ryan, ECF #13-7 at Pg. ID 278-79, attached to Am. Compl.) Even though no lawsuit is pending against the consumer at the time the Ownership and Delinquency Affidavit is signed, the affidavit nonetheless refers to the debt as "the obligation sued upon." (Am. Compl. at ¶59, ECF #13 at Pg. ID 214.)

---

[1] Plaintiffs also allege that Encore purchases some debt portfolios directly and then transfers the portfolios to Midland for collection. (*See* Am. Compl. ¶54, ECF #13 at Pg. ID 212.)

3. An officer of Midland signs the Ownership and Delinquency Affidavit. (*See id.* at ¶58, ECF #13 at Pg. ID 213-14.) The officer's signature purports to be notarized by Peterson. (*See id.* at ¶¶ 63-73, ECF #13 at Pg. ID 215-22.) However, the signature is not actually notarized by Peterson; instead, Midland "robo-signs" Peterson's signature in the notary block bearing her name. (*Id.*)

4. Midland sends the fraudulently-notarized Ownership and Delinquency Affidavit to one of the Defendant Attorneys who work for Asset Acceptance. (*See* Am. Compl. at ¶58, ECF #13 at Pg. ID 213-14.)

5. The Defendant Attorney prepares and files a complaint against the Michigan consumer in state court (the "Collection Complaint"). (*See id.* at ¶41, ECF #13 at Pg. ID 206-07.) The Defendant Attorney attaches the fraudulently-notarized Ownership and Delinquency Affidavit to the Collection Complaint. (*See id.* at ¶¶ 72, 84, ECF #13 at Pg. ID 218-19, 225.) The Collection Complaint lists Midland as the plaintiff and seeks payment of the debt identified in the Ownership and Delinquency Affidavit. (*See id.* at ¶41, ECF #13 at Pg. ID 206-07.)

6. The Defendant Attorney also "verifies" the Collection Complaint by signing his or her name under the following statement (the "Verification Statement"):

> I declare under the penalty of contempt of court that to the best of my knowledge, information and believe [sic] that this is good ground to support the contents of this pleading.

(*See* Am. Compl. at ¶¶ 43, ECF #13 at Pg. ID 208-09.)

7. The Defendant Attorney signs the Verification Statement without actually reading the Collection Complaint and without any actual knowledge of the facts that he or she purports to verify.[2] (*See id.* at

---

[2]Plaintiffs also contend that the Defendant Attorney's verification of the Collection Complaint is invalid because no provision of Michigan law or of the Michigan Court

¶¶ 42-43, 49, 52, ECF #13 at Pg. ID 207-208, 210-12.) The Defendant Attorney places the words "Verified Complaint Account Stated" in underlined and capital letters at the top of the Collection Complaint. (*See id.* at ¶¶ 41, 46, ECF #13 at Pg. ID 206-07, 209.)

8. The Defendant Attorney then serves the Collection Complaint and the fraudulently-notarized Ownership and Delinquency Affidavit on the Michigan consumer. (*See id.* at ¶117, ECF #13 at Pg. ID 236.)

According to Plaintiffs, Defendants' unlawful collection practices have the following effects:

> Time is money and a [d]efault [j]udgment is the ultimate goal of Defendants. . . . The use of false verifications and [fraudulent notarization by] robo-signers eliminates the cost of verifying that Defendants truly own the debt and that the debtor owes the amount [indicated by] the [Ownership and Delinquency Affidavit] and [Collection] Complaint. A 'sworn' affidavit takes the place of the necessary proof and paperwork and eliminates the associated cost of proving [that] the debt is owed to Defendants by class members. The fraud saves time and makes money.

(*Id.* at ¶¶ 78-79, ECF #13 at Pg. ID 223-24.)

## C

Plaintiffs Newman and Ryan allege that they were the victims of the above-described collection practices.

Ryan contends that in November 2015, Midland filed a Collection Complaint against her in Michigan state court (the "Ryan Collection Complaint"). (*See* ECF

Rules permits a pleading to be "verified" using the above quoted statement. (*See id.* at ¶¶ 44-45, ECF #13 at Pg. ID 209.)

#13-7 at Pg. ID 275-79.) The Ryan Collection Complaint is titled "Verified Complaint Account Stated," and it alleges that Ryan owed payments on a credit card account through Citibank, that Midland had purchased Ryan's account from Citibank, and that Midland was now seeking a judgment against Ryan for the $8,407.11 she allegedly owed. (*See id.*) Defendant Attorney Smith signed the Ryan Collection Complaint. (*See id.*) Attached to the Ryan Collection Complaint was an Ownership and Delinquency Affidavit signed by Midland officer, Jenna Taylor. (*See id.*) This affidavit stated:

> 1. I am an officer for MIDLAND FUNDING LLC and have access to pertinent records of this account maintained on behalf of Plaintiff. I am a competent person over eighteen years of age, and make the statements herein based upon personal knowledge of those account records maintained on Plaintiff's behalf. Plaintiff is the current owner of, and/or successor to, the obligation sued upon, and was assigned all the rights, title and interest to Defendant's CITIBANK, N.A. account XXXXXXXXXXXX9976 (hereinafter "the account"). I have access to and have reviewed the records pertaining to the account and am authorized to make this affidavit on Plaintiff's behalf.
>
> 2. The business records show that Defendant(s) owed a balance of $8,407.11 as of 2015-11-16.

(*Id.*, pen marks in original.) Taylor's affidavit purported to have been notarized by Peterson. But Ryan alleges that Peterson did not personally sign the affidavit and that instead Peterson's signature was "robo-signed." (Am. Compl. at ¶135, ECF #13 at Pg. ID 241.) The notarization signature was as follows:



(*See* ECF #13-7 at Pg. ID 279.)

Ryan says that she had the following reaction when she received the Collection Complaint and attached Ownership and Delinquency Affidavit:

> 1. I was sued in the 52-4 District Court . . . by Midland Funding, LLC. They were suing me for a debt from Citibank, N.A. I had previously been unable to pay the debt off.
>
> 2. Attached to the lawsuit from Midland was a sworn affidavit saying that they had business records from Citibank and that I owed them money. The affidavit of [sic] was signed by Jenna Taylor and notarized by a Karli Anne Peterson.
>
> 3. As the Affidavit was signed and notarized by them I believed them when they said they had the right to sue me on the debt and they had all the records. I did not know how I was going to fight as their affidavit proved I owed the debt to Midland.
>
> 4. I believe that Midland could win the lawsuit against me and make me pay them as their affidavit said they could.

(Ryan Declaration, ECF #13-12 at Pg. ID 401.)

Similarly, Newman alleges that in December 2015, Midland filed a Collection Complaint against her in Michigan state court (the "Newman Collection Complaint") seeking payment for $6,525.34 in alleged debt. (*See* ECF #13-7 at Pg. ID 280-84.) Defendant Attorney Perry signed the Newman Collection Complaint, and the complaint is titled "Verified Complaint Account Stated." (*See id.*) Attached

to the Newman Collection Complaint was an Ownership and Delinquency Affidavit

signed by Midland officer, Donna Dubois. (*See id.*)  This affidavit stated:

> 1.    I am an officer for MIDLAND FUNDING LLC and have access to pertinent records of this account maintained on behalf of Plaintiff.  I am a competent person over eighteen years of age, and make the statements herein based upon personal knowledge of those account records maintained on Plaintiff's behalf.  Plaintiff is the current owner of, and/or successor to, the obligation sued upon, and was assigned all the rights, title and interest to Defendants CITIBANK, N.A. account XXXXXXXXXXXX1239 (hereinafter "the account").  I have access to and have reviewed the electronic records pertaining to the account and am authorized to make this affidavit on Plaintiff's behalf.  The electronic records reviewed consist of data acquired from the seller when Plaintiff purchased the account, together with records generated in connection with servicing the account since the date the account was purchased by Plaintiff.
>
> 2.    The business records show that Defendant(s) owed a balance of $6,525.34 as of 2015-12-10.

(*Id.*, pen marks in original.)  Dubois' affidavit also purported to have been notarized

by Peterson.  But Newman alleges that Peterson did not personally sign the affidavit

and that instead Peterson's signature was "robo-signed." (Am. Compl. at ¶135, ECF

#13 at Pg. ID 241.)  The notarization signature was as follows:

 

(*See* ECF #13-7 at Pg. ID 284.)

Newman says that she had the following reaction when she received the

Collection Complaint and attached Ownership and Delinquency Affidavit:

1. I was served a lawsuit by Defendant Midland Funding, LLC from the 52-4 District Court. . . .It appeared to be based upon a debt I had owed to Citibank, N.A. Due to financial hardship, I was unable to pay that debt to Citibank N.A.

2. At the time I was served with the lawsuit, I was not familiar with being sued or legal documents. Midland had an affidavit attached to the lawsuit that stated that they were the owner of the debt based on business records it possessed and that I owed them money.

3. The Affidavit was signed by a [] Midland employee, Donna Dubois and notarized by a Karli Anne Peterson. Because it was a sworn Affidavit, I assumed that Midland did in fact own the debt and had business records from Citibank to prove that I owed the debt to them. It is what they were swearing to.

4. This was the only piece of paper that Midland gave me with the lawsuit that looked official and notarized. Because of that affidavit, it felt as though I had no choice but to believe them and I would lose the lawsuit.

(Newman Declaration, ECF #13-12 at Pg. ID 400.)

Newman and Ryan retained counsel and filed answers and counterclaims against Midland in the state court collection suits. (*See* State Court Docket, ECF #20-3.) Ryan also moved to strike the Ownership and Delinquency Affidavit. (*See id.* at Pg. ID 489.) She even persuaded the presiding state court judge that Peterson's signature on the notary block had likely been "forged." (State Court Transcript, ECF #13-2 at Pg. ID 255.) The state court judge therefore granted Ryan a hearing on her challenge to the Ownership and Delinquency Affidavit. But before that hearing

could occur, Midland and Ryan agreed to dismiss the state court action without prejudice so that the dispute could be litigated in this Court. (*See* State Court Docket, ECF #20-3.)  Likewise, Midland and Newman agreed to dismiss their state court claims and counterclaims without prejudice so that those claims could be litigated here. (*See id.*)

## D

On April 19, 2016, Newman and Ryan filed a proposed class-action lawsuit in this Court against the Defendants. (*See* ECF #1.)  Plaintiffs filed an Amended Complaint on May 24, 2016. (*See* ECF #13.)  Plaintiffs' Amended Complaint nominally contains three counts, but Counts One and Two actually consist of a number of individual claims. (*See* Am. Compl. at Pg. ID 246-50.)  In Count One, Plaintiffs allege that Defendants' collection practices violated various sections of the FDCPA. (*See id.*)  In Count Two, Plaintiffs allege that Defendants' collection practices violated various sub-sections of the MRCPA. (*See id.*)  In Count Three, Plaintiffs allege that Defendants' collection practices violated the RICO Act. (*See id.*)  Plaintiffs seek to sue on behalf of all Michigan consumers that were subject to Defendants' above-described collection practices within the statute of limitations of each respective statute. (*See id.* at ¶¶ 140-53, ECF #13 at Pg. ID 243-46.)

**E**

On July 1, 2016, Defendants moved under Rule 12(b)(6) to dismiss the Amended Complaint. (*See* ECF #20.) The Court held a hearing on the motion on October 24, 2016. At the hearing, the Court raised concerns about, among other things, whether Plaintiffs had standing, under Article III of the United States Constitution, to challenge Defendants' collection practices in federal court. Specifically, the Court questioned whether Newman and Ryan had adequately pleaded that they personally had suffered a "concrete" injury due to each of Defendants' allegedly unlawful collection practices. After the hearing, the Court ordered Plaintiffs to show cause why their claims should not be dismissed for lack of standing. (*See* Order to Show Cause, ECF #34.) Plaintiffs filed their response to the show cause order on March 20, 2017, and Defendants replied on April 10, 2017. (*See* ECF ## 35, 37.)

**II**

Federal courts are courts of limited jurisdiction. As the United States Court of Appeals for the Sixth Circuit has explained:

> The threshold question in every federal case is whether the court has the judicial power to entertain the suit. Article III of the United States Constitution prescribes that federal courts may exercise jurisdiction only where an actual 'case or controversy' exists. *See* U.S. Const. art. III, § 2. Courts have explained the 'case or controversy' requirement through a series of 'justiciability doctrines,' including,

> 'perhaps the most important,' that a litigant must have
> 'standing' to invoke the jurisdiction of the federal courts.

*Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 709 (6th Cir. 2015) (internal quotation marks and citations omitted). Thus, the Court will first consider whether Plaintiffs have Article III standing to bring their claims in this forum.

## A

### 1

As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). A plaintiff "must have standing for each claim pursued in federal court." *Parsons*, 801 F.3d at 710 (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

"To satisfy the 'irreducible minimum of standing,' the plaintiff must establish that: (1) he has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent rather than conjectural or hypothetical; (2) that there is a causal connection between the injury and the defendant's alleged wrongdoing; and (3) that the injury can likely be redressed." *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017) (quoting *Lujan*, 504 U.S. at 560-61). "Where, as here, a case is at the pleading stage, the plaintiff must clearly … allege facts demonstrating each element [of standing]." *Spokeo Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016) (citing *Warth v. Seldin*, 422 U.S. 490, 518 (1975)) (internal quotation marks omitted).

Moreover, "[t]hat a suit may be a class action adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they *personally* have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." *Id.* at 1547 n.6 (citations and internal quotation marks omitted) (emphasis added).

## 2

The component of standing primarily at issue in this case is the requirement that a plaintiff personally suffer a "concrete" injury. To be "concrete," a plaintiff's injury "must be '*de facto*'; that is, it must actually exist" and cannot be "abstract." *Id.* at 1548.

A plaintiff cannot satisfy its burden to show a concrete injury merely by pleading that the defendant violated a federal statute. As the Supreme Court explained in *Spokeo*:

> Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. For that reason, [a plaintiff] could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III.

*Spokeo*, 136 S.Ct. 1549. Accordingly, allegations of "a statutory violation in and itself [are] insufficient to establish standing" because not all statutory violations cause the plaintiff to suffer a concrete injury. *Lyshe*, 854 F.3d at 859. Put differently,

"a mere wave of the Congressional hand – *i.e.* the creation of a cause of action – is not enough to render an abstract injury concrete" for purposes of Article III standing. *Bock v. Pressler & Pressler, LLP*, --- F.Supp.3d ----, 2017 WL 2304643, at *5 (D. N.J. May 25, 2017) (citing *Spokeo*, 136 S.Ct. at 1549.)

**B**

In response to the Court's show cause order, Plaintiffs identified a number of alleged injuries that they claim are sufficiently concrete to satisfy Article III. Below, the Court analyzes whether each alleged injury is concrete and whether Newman and Ryan personally suffered that injury.

**1**

First, Plaintiffs argue that they suffered a concrete injury under Article III because they received false information from Defendants. (*See* Pl.'s Resp. to Order to Show Cause, ECF #35 at Pg. ID 838, 841-42.) In support of this "receipt of false information" theory of concrete injury, Plaintiffs cite a number of district court cases that each trace back to the unpublished decision of the United States Court of Appeals for the Eleventh Circuit in *Church v. Accretive Health*, 654 Fed. App'x 990 (11th Cir. 2016). In *Church*, the Eleventh Circuit held that a consumer suffered a concrete injury when she did not receive certain disclosures required by the FDCPA, despite the fact that she suffered no actual harm from this error. *See id.* at 991, 995. Here, Plaintiffs argue that Section 1692e of the FDCPA similarly granted them "a

right to truthful information," and thus they suffered a concrete injury when Defendants denied them this right. (Pl.'s Resp. to Order to Show Cause, ECF #35 at Pg. ID 841-42.)

In *Lyshe*, *supra*, however, the Sixth Circuit rejected the notion that a consumer suffers a concrete injury any time that she receives false information, no matter how trivial, during the collection process. *Lyshe*, 854 F.3d at 860-61. In that case, Lyshe sought damages under the FDCPA because the defendant debt collector had misrepresented to him that Ohio court rules require that responses to requests for admission be sworn and notarized. *See id.* at 858. But Lyshe did not "allege that he was misled, that he felt compelled to make a sworn verification or engage a notary, or that he even responded to the challenged requests." *Id.* at 857. Instead, Lyshe argued, based upon the Eleventh Circuit's decision *Church*, that he suffered a concrete injury when the debt collector infringed upon his "right not to receive false information in connection with the collection of a debt." *Id.* at 860. The Sixth Circuit "decline[d] to follow" *Church* and held that a consumer's receipt of false information, standing alone, does not automatically result in a concrete injury under Article III. *See id.* at 859-62.

In light of *Lyshe*, the Court cannot conclude that Plaintiffs suffered a concrete injury simply because they received allegedly-false information. Rather, in order to

determine whether Plaintiffs suffered a concrete injury, the Court must examine how the Plaintiffs' receipt of that allegedly-false information actually impacted them.

In the Amended Complaint, Plaintiffs allege that they personally received the following false information from Defendants:

- The "Verified" label on the Newman and Ryan Collection Complaints was false because the Defendant Attorneys did not verify the complaints in accordance with the Michigan Court Rules. (*See* Am. Compl. at 43-46, ECF #13 at Pg. ID 208-09; Newman and Ryan Collection Complaints, ECF #13-7.)

- The Defendant Attorneys' signature on the Newman and Ryan Collection Complaints falsely implied that they had meaningfully reviewed the content of those complaints. (*See* Am. Compl. at ¶154i, ECF #13 at Pg. ID 247-48.)

- The Ownership and Delinquency Affidavits created the false impression that, prior to their creation, Midland had commenced a collection action when, in fact, no collection action was pending when the Midland officers signed the affidavits. The Ownership and Delinquency Affidavits created this false impression by referring to Newman and Ryan's debts as "the obligation sued upon" and using a "case caption" (*e.g.* Midland Funding v. Ryan). (*See id.* at ¶¶ 59, 107-108, ECF #13 at Pg. ID 214, 233-34.)

Critically, Plaintiffs do not allege that their receipt of this allegedly-false information caused them *any* harm – much less harm that the FDCPA was designed to prevent. Indeed, Plaintiffs do not allege that they, personally, were affected in *any* way by their receipt of the information in the above bullet-points. For instance,

they do not allege that they saw the word "verified" in the captions of the Collection Complaints nor do they claim that the purported "verification" of the Collection Complaints had any impact upon their consideration of the allegations in the complaints. Likewise, Plaintiffs do not allege that they saw the "fake" captions of the Ownership and Delinquency Affidavits or the references in those affidavits to the "obligation sued upon," nor do they allege that those features of the affidavits had any impact on them at all. Finally, Plaintiffs do not allege that they saw the Defendant Attorneys' signatures on the Collection Complaints nor do they allege that those signatures led them (Plaintiffs) to conclude that the attorneys had been meaningfully involved in preparing the complaints. Because Plaintiffs have not alleged that their receipt of the allegedly-false information described in the bullet-points above affected or harmed them in any way, they have plainly failed to allege that their receipt of that information resulted in a concrete harm.[3]

---

[3] In the Amended Complaint, Plaintiffs allege that they received an additional item of false information. Specifically, Plaintiffs allege that the Ownership and Delinquency Affidavits falsely stated that they had been notarized by Peterson. (*See* Am. Compl. at ¶¶ 63-73, ECF #13 at Pg. ID 215-22.) And Plaintiffs allege that this allegedly-false notarization did impact their assessment of the Collection Complaints. (*See* Newman and Ryan Declarations, ECF #13-12.) For the reasons explained in Section II-B-5, *infra,* the Court finds that this fraudulent notarization did cause Plaintiffs to suffer a concrete injury.

Plaintiffs further argue that they suffered a concrete injury because they faced a "substantial risk" of default judgment when they received the Collection Complaints and the attached Ownership and Delinquency Affidavits. (Pl.'s Resp. to Order to Show Cause, ECF #35 at Pg. ID 844, 848.) In support of this theory, Plaintiffs rely upon the Supreme Court's opinion in *Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, 1150 n.5 (2013). (*See id.*) *Clapper* does not support Plaintiffs having Article III standing in this case.

In *Clapper*, the Supreme Court considered whether plaintiffs had Article III standing to challenge the constitutionality of a government electronic surveillance program. The *Clapper* plaintiffs argued that they had Article III standing because "there [was] an objectively reasonably likelihood that their communications with their foreign contacts [would be] intercepted [by the program] in the future." *Id.* at 1447. The Supreme Court disagreed and held that the plaintiffs did not have Article III standing because the "risk of harm" was too speculative and "the threatened injury" was not "certainly impending." *Id.* at 1147-48 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

The Supreme Court's analysis in *Clapper* confirmed that the risk-based standing inquiry is *forward* looking – at the time of suit, the plaintiff must face "a substantial risk that the harm *will* occur." *Id.* at 133 S.Ct. at 1150 n.5 (emphasis

added).  Here, Plaintiffs do not allege in their Amended Complaint that they continue to face the risk of default judgment as a result of Defendants' collection practices. Indeed, Plaintiffs have already responded to, and secured a dismissal of, Midland's collection suits.  Because any risk of default judgment passed before Plaintiffs filed this action, *Clapper* is of no help to Plaintiffs and does not provide them standing to sue based on this risk.[4]

**3**

Next, Plaintiffs argue that Defendants' failure to maintain adequate procedures to prevent violations of the FDCPA and MRCPA, itself, caused a concrete injury sufficient to confer standing. (*See* Pl.'s Resp. to Order to Show Cause, ECF #35 at Pg. ID 838, 844-846, 852.)  In support of that theory, Plaintiffs cite only one case: the decision of the United States District Court for the Southern District of Ohio in *Galaria v. Nationwide Mut. Co.,* 998 F. Supp. 2d 646 (S.D. Ohio 2014). (*See id.*)  *Galaria* does not support Plaintiffs' position here.

The district court in *Galaria* held that the plaintiff *lacked* standing. *See id.* at 660.  And while the Sixth Circuit later reversed that ruling, *see Galaria v.*

---

[4] In Plaintiffs' response to the Court's Order to Show Cause, they also argue that they suffered a concrete injury because the "substantial risk" of default judgment "necessitated [Plaintiffs] incurring legal costs to avoid" the default judgment. (ECF #35 at Pg. ID 848.)  But Plaintiffs do not plead in the Amended Complaint that they personally incurred any legal costs (or any other mitigation costs) in defending the state court collection suits.

*Nationwide Mut. Co.*, 663 Fed. App'x 384 (6th Cir. 2016), nothing in the Sixth Circuit's decision supports Plaintiffs' argument that the Defendants' alleged failure to maintain adequate procedures to prevent FDCPA violations inflicted a concrete injury upon them. *See id.* The Sixth Circuit held only that a sufficiently serious risk of future harm, coupled with reasonably-incurred mitigation costs, was sufficient to confer standing. The Sixth Circuit did not hold that a defendant's failure to implement preventative measures, standing alone, amounts to a concrete injury. *See id.* at 388-89. Simply put, Plaintiffs have not cited any authority to support their assertion that a defendant's failure to adopt sufficient preventive measures, standing alone, constitutes a concrete injury for Article III purposes, and this Court declines to so hold here.

**4**

Plaintiffs also suggest that they may sue for injuries allegedly suffered by members of the class they seek to certify. (*See, e.g.*, Am. Compl. at ¶76, ECF #13 at Pg. ID 223.) Plaintiffs sometimes refer to these members as "Michigan Consumer[s]." (*See e.g.*, Am. Compl. at ¶84, ECF #13 at Pg. ID 225.) Among other injuries, Plaintiffs' assert that class members were allegedly tricked into believing that they had "no defense" to the Collection Complaints and class members allegedly had default judgments improperly entered against them. (*Id.* at ¶¶ 84-85, 87, 113, ECF #13 at Pg. ID 225-26, 235.)

But Plaintiffs' did not personally suffer these injuries.  Neither Newman nor Ryan concluded that they had "no defense" in the state court collection action filed against them.   Indeed, both Newman and Ryan hired counsel and successfully secured dismissals of Midland's actions against them.  And the Plaintiffs did not suffer a "default judgment" as a result of Defendants' alleged collection practices.

Article III does not confer Plaintiffs standing to act as private attorneys general seeking recovery on behalf of other Michigan residents who allegedly suffered injuries above and beyond those allegedly suffered by Plaintiffs themselves. Rather, to have standing, Plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." *Warth*, 422 U.S. at 502; *see, also, Spokeo*, 136 S.Ct. at 1547 n.6 (same), *Soehnlen v. Fleet Owners Insurance Fund*, 844 F.3d 576, 583 (6th Cir. 2016) (same).   Therefore, the alleged injuries suffered by putative class members or "Michigan Consumers," but not by Plaintiffs themselves, are insufficient (and irrelevant) to Plaintiffs' standing in this case.

**5**

Finally, Plaintiffs allege that they suffered a concrete injury because Defendants' filing of the fraudulently-notarized Ownership and Delinquency Affidavits in the Collection Actions "eliminate[ed]" Defendants' "burden of proof" in those actions. (Am. Compl. at ¶77, ECF #13 at Pg. ID 223.)  Plaintiffs are partly

correct. Contrary to Plaintiffs' description, the filing of the fraudulently-notarized affidavits did not eliminate the "burden of proof" in the Collection Actions. Instead, as described below, that filing shifted the burden of production. And that shift did inflict a concrete injury upon Plaintiffs. Thus, Plaintiffs correctly argue that they have standing to assert claims based upon the filing of the fraudulently-notarized Ownership and Delinquency Affidavits.

In order to understand the effect of the fraudulently-notarized Ownership and Delinquency Affidavits in the Collection Actions, one must begin with the Michigan Court Rule that governs responsive pleadings, MCR 2.111(C). Under that rule, a defendant may respond to an allegation by, among other things, denying the truth of the allegation, MCR 2.111(C)(2), or by stating that he "lacks knowledge or information sufficient to form a belief as to the truth of an allegation" – a response that "has the effect of a denial." MCR 2.111(C)(3). Where a defendant denies the truth of an allegation or pleads that he lacks information concerning its truth, he has no burden to come forward with any evidence unless and until the plaintiff carries its burden of production at trial or in connection with a dispositive motion.

But a Michigan statute, MCL § 600.2145 (the "Affidavit Statute"), creates an exception to this ordinary course of events when a plaintiff bringing an action for an account stated attaches to his complaint an affidavit attesting to the amount owing.

The Affidavit Statute provides that such an affidavit, unless countered by an opposing sworn affidavit, is *prima facie* evidence of the defendant's indebtedness:

> In all actions brought in any of the courts of this state, to recover the amount due on an open account or upon an account stated, if the plaintiff or someone in his behalf makes an affidavit of the amount due, as near as he can estimate the same, over and above all legal counterclaims and annexes thereto a copy of said account, and cause a copy of said affidavit and account to be served upon the defendant, with a copy of the complaint filed in the cause or with the process by which such action is commenced, such affidavit shall be deemed prima facie evidence of such indebtedness, unless the defendant with his answer, by himself or agent, makes an affidavit and serves a copy thereof on the plaintiff or his attorney, denying the same. … Any affidavit in this section mentioned shall be deemed sufficient if the same is made within 10 days next preceding the issuing of the writ or filing of the complaint or answer.

MCL § 600.2145.  The Affidavit Statute, "when correctly followed, eases the burden on a creditor" because "[a] proper affidavit … shifts to the debtor the burden of going forward with proof that the amount claimed is inaccurate." *Lipa v. Asset Acceptance, LLC*, 572 F. Supp. 2d 841, 850 (E.D. Mich. 2008).  If a debtor faced with a proper affidavit cannot come forward with such evidence, judgment will be entered against him.  However, "[i]f the affidavit is defective or is rebutted by the [debtor] with competent proof, the [creditor] simply is left with the burden to prove its case in the usual fashion." *Id.*

Against this background, it is clear that the Defendants' filing of the fraudulently-notarized Ownership and Delinquency Affidavits with the Collection Complaints caused both Newman and Ryan to suffer a real and concrete harm. Due to the filing of the affidavits, Newman and Ryan could not respond to the Collection Complaints by merely denying the allegations and/or pleading that they lacked information concerning the allegations as they could in a normal case; doing so would have given Midland a clear path to the entry of judgment. In order to avoid the entry of judgment against them, Newman and Ryan had to come forward with a competing affidavit denying that they owed the debt to Midland. But they could not do so because at the time they received the Collection Complaints, they had no idea who Midland was and did not know whether Midland had, in fact, purchased their debts to Citibank. (*See* Newman and Ryan Declarations, ECF #13-12.) Thus, the only way that Newman and Ryan could avoid the entry of judgment against them was to file a motion attacking the validity of the affidavits.

In summary, the filing of the falsely-notarized affidavits (1) shifted to Newman and Ryan a burden of production that they could not carry and (2) forced Newman and Ryan to file a motion to strike the affidavits in order to prevent the entry of judgment against them. Put differently, the Defendants' fraudulent-notarization forced Newman and Ryan's hand in state court and put them at an unfair

disadvantage in the state court collection proceedings.  This was a real and concrete injury.

## C

The fact that Plaintiffs suffered the single concrete injury identified above does not automatically grant them Article III standing to challenge all of Defendants' collection practices that are identified in the Amended Complaint.  That is because Plaintiffs must also satisfy the causation element of Article III standing – *i.e.*, each must demonstrate that her concrete injury is "fairly traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560-561 (internal quotations marks omitted).

Plaintiffs' sole concrete injury – facing an unfair burden of production in state court and having to take steps to get out from under that burden – is fairly traceable to only one of Defendants' collection practices: the filing of the fraudulently-notarized Ownership and Delinquency Affidavits.  Thus, Plaintiffs only have Article III standing to pursue claims based upon the Defendants' filing of those affidavits.[5]

Plaintiffs' single concrete injury is not fairly traceable to any of Defendants' other alleged collection practices that Plaintiffs identify in the Amended Complaint. More specifically, the burden of production that Plaintiffs faced under the Affidavit Statute was not the result of any of the following collection practices:

---

[5] Defendants do not dispute that Plaintiffs have satisfied the "redressability" prong of Article III standing by seeking damages under the FDCPA, MRCPA, and RICO Act.

- Defendants' labeling the Collection Complaints" as "Verified";

- Defendants' use of case captions and the words "the obligation sued upon" in the Ownership and Delinquency Affidavits;

- Defendant Attorneys' failure to meaningfully review the substance of the Collection Complaints prior to signing those complaints;

- Defendants' failure to attach documents to the Collection Complaint proving the underlying obligation; and

- Defendants' use of the collection practices to secure default judgments from Michigan consumers and to collect debt that Midland does not own.

Thus, Plaintiffs lack Article III standing to bring claims that challenge the above collection practices, and these claims in the Amended Complaint are **DISMISSED** for lack of subject-matter jurisdiction. More specifically, to the extent that Plaintiffs' claims in the Amended Complaint are based on anything other than the Defendants' filing of the fraudulently-notarized Ownership and Delinquency Affidavits in state court, those claims are **DISMISSED** for lack of subject-matter jurisdiction.

### III

The Court now considers the merits of Plaintiffs' claims that the Defendants' filing of fraudulently-notarized Ownership and Delinquency Affidavits violated the FDCPA, MRCPA, and RICO Act. Defendants move to dismiss these claims under Federal Rule of Civil Procedure 12(b)(6).

## A

Rule 12(b)(6) provides for dismissal of a complaint when a plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *Id.* (citing *Twombly*, 550 U.S. at 556). When assessing the sufficiency of a plaintiff's claim, a district court must accept all of a complaint's factual allegations as true. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001). "Mere conclusions," however, "are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664. A plaintiff must therefore provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss. *Twombly*, 550 U.S. at 556. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**B**

The Court begins with Plaintiffs' claim that the Defendants' filing of fraudulently-notarized Ownership and Delinquency Affidavits violated the FDCPA. "Congress passed the FDCPA to address the widespread and serious national problem of debt collection abuse by unscrupulous debt collectors." *Currier v. First Resolution Inv. Corp.*, 762 F.3d 529, 533 (6th Cir. 2014) (citing S. Rep. No. 95-382, at 2 (1977)). The stated purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). Defendants do not dispute that they are "debt collectors" for purposes of FDCPA liability.

The FDCPA "prohibits a wide array of specific conduct, but it also prohibits, in general terms, any harassing, unfair, or deceptive collection practice." *Currier*, 762 F.3d at 533. These general terms enable "courts, where appropriate, to proscribe other improper conduct which is not specifically addressed." *Id.* (quoting S. Rep. No. 95-382 at 4 (1977)). Thus, the Sixth Circuit has characterized the reach of the FDCPA as "extraordinarily broad." *Id.* (quoting *Barany-Snyder v. Weiner,* 539 F.3d 327, 333 (6th Cir. 2008)).

"To determine whether conduct fits within the broad scope of the FDCPA, the conduct is viewed through the eyes of the 'least sophisticated consumer.'" *Id.* The least-sophisticated-consumer standard protects "the gullible and shrewd alike" but presumes "a basic level of reasonableness and understanding on the part of the [consumer]." *Id.* The standard thus insulates debt collectors from "liability for bizarre or idiosyncratic interpretations of debt collection notices." *Id.*

In Count One of the Amended Complaint, Plaintiffs allege that Defendants' filing of the fraudulently-notarized Ownership and Delinquency Affidavits violated three sections of the FDCPA: 1692d, 1692e, and 1692f. (*See* Am. Compl. at ¶154, ECF #13 at Pg. ID 246-47.) Section 1692d prohibits "harassment and abuse"; Section 1692e prohibits the use of "false or misleading representations"; and Section 1692f prohibits the use of "unfair practices." 15 U.S.C. §§ 1692d, 1692e, 1692f. The Court will analyze each of these sections in turn.

## 1

The Court first considers whether Defendants violated Section 1692d of the FDCPA by allegedly filing fraudulently-notarized Ownership and Delinquency Affidavits.

Section 1692d provides:

### Harassment or abuse

A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any

person in connection with the collection of a debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The use or threat of use of violence or other criminal means to harm the physical person, reputation, or property of any person.

(2) The use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader.

(3) The publication of a list of consumers who allegedly refuse to pay debts, except to a consumer reporting agency . . .

(4) The advertisement for sale of any debt to coerce payment of the debt.

(5) Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.

(6) Except as provided in [15 U.S.C. 1692b], the placement of telephone calls without meaningful disclosure of the caller's identity.

15 U.S.C. § 1692d.

In *Harvey v. Great Seneca Fin. Corp*, 453 F.3d 324 (6th Cir. 2006), the Sixth Circuit considered the scope of liability under Section 1692d. More specifically, the court considered whether the defendants had violated Section 1692d when they filed "a debt-collection lawsuit without immediate means of proving the debt." *Id.* at 330. The Sixth Circuit advised that "although the question of 'whether conduct harasses, oppresses, or abuses will ordinarily be a question for the jury, Congress has indicated

its desire for the courts to structure the confines of §1692d." *Id.* at 330 (quoting *Jeter v. Credit Bureau*, 760 F.2d 1168, 1179 (11th Cir. 1985)) (internal quotation marks and punctuation marks omitted). The court then described the scope of conduct that falls within the confines of Section 1692d as follows:

> Although non-exhaustive, the examples of oppressive conduct listed in §1692d concern tactics intended to embarrass, upset, or frighten a [consumer]. They are likely to cause the "suffering and anguish" which occur when the debt collector attempts to collect money which the [consumer], through no fault of his own, does not have. These tactics are not comparable to the single filing of a debt-collection lawsuit."

*Id.* (quoting *Montgomery v. Huntington Bank,* 346 F.3d 693, 700 (6th Cir. 2003).

In their response to Defendants' motion to dismiss, Plaintiffs do not cite a single case in which a debt collector was held liable under Section 1692d for a false statement in an affidavit. Indeed, Plaintiffs do not cite *any* cases in support of their claim under Section 1692d. (*See* Pl.'s Resp. Br., ECF #23 at Pg. ID 554-55.) And contrary to Plaintiffs' position, courts in this circuit have held that a false statement within an affidavit is insufficient to trigger liability under Section 1692d. *See, e.g.*, *Delawder v. Platinum Financial Services Corp.*, 443 F.Supp.2d 942, 947-49 (S.D. Ohio. 2005) (holding that "the filing of . . . an affidavit is not the kind of conduct intended to be covered by Section 1692d" despite that affidavit allegedly inflating the amount of debt owed by the consumer); *Hartman v. Asset Acceptance Corporation*, 467 F.Supp.2d 769, (S.D. Ohio 2004) (holding that the filing of an

affidavit that misrepresented that the collector was a "holder in due course" is "not the kind of conduct covered by [Section] 1692d as a matter law"). Plaintiffs do not attempt to distinguish these cases or explain how the reasoning in these cases is flawed. Thus, the Court finds that Plaintiffs have failed to plausibly allege that Defendants' filing of fraudulently-notarized Ownership and Delinquency Affidavits constituted harassment, oppression, or abuse that is actionable under Section 1692d. Plaintiffs' Section 1962d claim is therefore dismissed.

## 2

Next, the Court considers whether the Plaintiffs have plausibly alleged that the Defendants' filing of the fraudulently-notarized Ownership and Delinquency Affidavits violated Section 1692e of the FDCPA.

Section 1692e provides that a "debt collector may not use any false, deceptive, or misleading representation in connection with the collection of any debt." 15 U.S.C. § 1692e. The section then identifies sixteen specific debt collection practices that are "violation[s] of [the] section." 15 U.S.C. § 1692e.[6] One prohibited debt

---

[6] The scope of Section 1692e is broader than just the sixteen specifically-identified examples of prohibited conduct listed in Section 1692e. *See* 15 U.S.C. § 1692e, (expressly stating that the sixteen examples of prohibited conduct do not "limit[] general application" of Section 1692e's prohibition of false, deceptive and misleading representations in connection with the collection of any debt); *see, also*, *Currier*, 762 F.3d at 533 ("The [FDCPA] prohibits a wide array of conduct, but it also prohibits, in general terms, any harassing, unfair, or deceptive debt collection practice, which enables the courts, where appropriate, to proscribe other improper

collection practice identified in Section 1692e is the "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. § 1692e(10).

The Sixth Circuit has established the following standard for evaluating claims under Section 1692e:

> Whether a debt collector's actions are false, deceptive, or misleading under §1692e is based on whether the "least sophisticated consumer" would be misled by defendant's actions. In addition, in applying this standard, we have also held that a statement must be *materially* false or misleading to violate Section 1692e. The materiality standard simply means that in addition to being technically false, a statement would tend to mislead or confuse the reasonable unsophisticated consumer.

*Wallace v. Washington Mutual Bank, F.A.*, 683 F.3d 323, 326 (6th Cir. 2012) (internal citations omitted).

Plaintiffs' allegations satisfy this standard. Plaintiffs plausibly allege that:

- Defendants' allegedly fraudulent notarization was a false representation to Plaintiffs (and the state court) that the Ownership and Delinquency Affidavits had been reviewed, certified, and signed by a notary.

- This allegedly false representation was made during the course of state court debt collection proceedings, and therefore falls squarely within both Section 1692e's general prohibition against the "use any false, deceptive, or misleading representation in connection with the collection of any debt" and Section 1692e's

---

conduct which is not specifically addressed.") (internal quotation marks and citations omitted).

specific prohibition against the "use of any false representation or deceptive means to collect or *attempt to collect* any debt." 15 U.S.C. § 1692e(10) (emphasis added).

- Defendants' use of the fraudulent notarization was "material" because it "would tend to mislead or confuse the reasonable unsophisticated consumer," *Wallace*, 683 F.3d at 326, into accepting that the Ownership and Delinquency Affidavits was a valid affidavit under the Affidavit Statute that would shift a burden of production to the consumer that the consumer could not carry. (*See* Part II-B-5 *supra*.) *See Delawder*, 443 F.Supp.2d at 948 (upholding claims under 15 U.S.C. § 1692e(10), where the debt collector allegedly attached an affidavit to the collection complaint that contained "false and frivolous" assertions).[7]

Accordingly, the Court declines to dismiss Plaintiffs' claim under Section 1692e to the extent that that claim is based on Defendants' filing of the fraudulently-notarized Ownership and Delinquency Affidavits in state court.

**3**

Finally, the Court considers whether Defendants' filing of the fraudulently-notarized Ownership and Delinquency Affidavits violated Section 1692f of the

---

[7] In an attempt to distinguish *Delawder*, Defendants argue that in that case, the debt collector had misrepresented the *amount* of the debt, while Plaintiffs here "challenge only technical aspects of the [Delinquency and Ownership Affidavits]." (*See* Def.'s Reply Br, ECF #25 at Pg. ID 576.) But Defendants' alleged fraudulent-notarization of the Ownership and Delinquency Affidavits was not merely a "technical" misrepresentation that had no impact on Plaintiffs. As explained in Part II-B-5 *supra*, the alleged fraud put Plaintiffs at a disadvantage in the state court collection proceedings and thereby caused them to suffer concrete and material harm.

FDCPA. (*See* Am. Compl. at ¶154b, ECF #13 at Pg. ID 246.) Section 1692f provides that a "debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

The Court concludes that Plaintiffs have plausibly alleged that Defendants' filing of the fraudulently-notarized Ownership and Delinquency Affidavits was an "unfair" practice prohibited by Section 1692f. This alleged fraud provided Defendants an unjustified advantage over Plaintiffs in the state court collection suits by (1) shifting to Plaintiffs a burden of production that they could not satisfy and (2) forcing Plaintiffs to file a motion to strike the affidavits in order to prevent an entry of judgment against them. (*See* Part II-B-5 *supra*.)

In their motion to dismiss, Defendants rely upon cases outside this circuit to argue that Plaintiffs cannot bring a claim under Section 1692f for "conduct that is already explicitly addressed by other sections of the FDCPA." (ECF #20 at Pg. ID 444-45.) According to Defendants, because Plaintiffs' claim under Section 1692f is based on the same conduct that Plaintiffs' allege violated Section 1962e, the Court should dismiss Plaintiffs' Section 1962f claim. (*See id.*)

However, the Sixth Circuit has not adopted the rule upon which the Defendants rely. Instead, the Sixth Circuit has explained that:

> While "misleading" practices under § 1692e and "unfair" practices under § 1692f reference separate categories of prohibited conduct, they are broad, potentially overlapping, *and are not mutually exclusive*. A debt

> collector's action could be "misleading" under § 1692e, "unfair" under § 1692f, or, as alleged here, *both*.

*Currier*, 762 F.3d at 536. Thus, the Court declines to dismiss Plaintiffs' claim under Section 1692f to the extent that that claim is based on Defendants' filing of the fraudulently-notarized Ownership and Delinquency Affidavits in state court.

## C

The Court now moves to Plaintiffs' claim that Defendants' filing of the fraudulently-notarized Ownership and Delinquency Affidavits violated the MRCPA.

The MRCPA provides in relevant part:

### M.C.L. §445.252
### Prohibited Acts

> A regulated person shall not commit 1 or more of the following acts:
>
> (a) Communicating with a debtor in a misleading or deceptive manner, such as using the stationary of an attorney or credit bureau unless the regulated person is an attorney or is a credit bureau and it is disclosed that it is the collection department of the credit bureau.
> (b) Using forms or instruments which simulate the appearance of judicial process.
> (…)
> (e) Making an inaccurate, misleading, untrue, or deceptive statement or claim in a communication to collect a debt or concealing or not revealing the purpose of a communication when it is made in connection with collecting a debt.
> (f) Misrepresenting in a communication with a debtor 1 or more of the following:

(i) The legal status of a legal action being taken or threatened.
(ii) The legal rights of the creditor or debtor.
(…)
(…)
(n) Using a harassing, oppressive, or abusive method to collect a debt . . .
(…)

M.C.L. § 445.252. (*See* Am. Compl. at Pg. ID 248-249.)

This Court has previously held that "[MRCPA] claims which 'simply duplicate … claims under the FDCPA' need not be addressed separately." *Scheuer v. Jefferson Capital Sys., LLC*, 43 F. Supp. 3d 772, 786 (E.D. Mich. 2014) (quoting *Newman v. Trott & Trott, P.C.*, 889 F.Supp.2d 948, 967 (E.D. Mich. 2012)).  Both Plaintiffs and Defendants agree with this approach. (*See* Mot. To Dismiss, ECF #20 at Pg. ID 455-46; Pl.'s Resp. Br., ECF #23 at Pg. ID 567.)

Plaintiffs assert three claims under the MRCPA that duplicate their claims under the FDCPA.  First, Plaintiffs allege that Defendants' fraudulent notarization of the Ownership and Delinquency Affidavits violated MCL § 445.252(a). (*See* Am. Compl. at ¶ 87f, ECF #13 at Pg. ID 249.)  As noted above, this subsection prohibits "[c]ommunicating with a debtor in a misleading or deceptive manner." MCL §445.252(a).  Plaintiffs' claim under MCL § 445.252(a) essentially mirrors Plaintiffs' claim under Section 1692e of the FDCPA for false, misleading, and deceptive practices. (*See* Part III-B-2, *supra*.)  Thus, for the same reasons that the Court declined to dismiss Plaintiffs' Section 1692e claim based on the fraudulently-

notarized Ownership and Delinquency Affidavits, the Court declines to dismiss Plaintiffs' claim under MCL § 445.252(a) to the extent that that claim is based on those affidavits. (*See id*.)

Second, Plaintiffs assert that Defendants' alleged fraudulent notarization of the Ownership and Delinquency Affidavits violated MCL § 445.252(e). (*See* Am. Compl. at ¶87b, ECF #13 at Pg. ID 248.) This subsection prohibits the use of an "inaccurate, misleading, untrue, or deceptive statement or claim in a communication to collect a debt." MCL §445.252(e). The Court declines to dismiss Plaintiffs' claim under MCL § 445.252(e) because it too duplicates Plaintiffs' "false, misleading, and deceptive practices" claim under Section 1692e of the FDCPA. (*See* Part III-B-2, *supra*).

Third, Plaintiffs assert that Defendants' alleged fraudulent notarization of the Ownership and Delinquency Affidavits violated MCL § 445.252 (n). (Am. Compl. at ¶87a, ECF #13 at Pg. ID 248.) This subsection prohibits the use of "a harassing, oppressive, or abusive method to collect a debt." MCL §445.252(n). Plaintiffs' claim under MCL § 445.252 (n) duplicates Plaintiffs' claim under Section 1692d of the FDCPA for harassing, oppressive, and abusive conduct. (*See* Part III-B-1, *supra*.) For the same reasons that the Court dismissed Plaintiffs' claim under Section 1692d, the Court concludes that Plaintiffs have failed to state a plausible claim under MCL § 445.252(n). (*See id.*)

Plaintiffs also bring two claims challenging Defendants' fraudulent notarization of the Ownership and Delinquency Affidavits that are not duplicative of their claims under the FDCPA. Both claims are deficient as a matter of law. First, Plaintiffs bring a claim under MCL § 445.252(b), which prohibits "using forms or instruments which simulate the appearance of judicial process." (*See* Am. Compl. at ¶87b, ECF #13 at Pg. ID 249). Plaintiffs' claim under MCL § 445.252(b) fails because Defendants' alleged fraudulent notarization of the Ownership and Delinquency Affidavits did not simulate the appearance of judicial process. Second, Plaintiffs bring a claim under MCL § 445.252(f), which prohibits misrepresentations regarding the "legal status of a legal action" or the "legal rights of the creditor or debtor." (*See id.* at ¶87c.) Plaintiffs' claim under MCL § 445.252(f) fails because Defendants' alleged fraudulent notarization of the Ownership and Delinquency Affidavits did not misrepresent the legal status of the debt collection action against Newman and Ryan and did not misrepresent their legal rights.

In summary, Plaintiffs plead viable claims under MCL § 445.252(a) and (e) to the extent that these claims are based on the Defendants' alleged filing of fraudulently-notarized Ownership and Delinquency Affidavits in state court. Plaintiffs fail to state a plausible claim under MCL §§ 445.252(b), (f), and (n).

**D**

In Count Three of the Amended Complaint, Plaintiffs allege that Defendants engaged in racketeering activity in violation of Section 1962 of the RICO Act. (*See* Am. Compl. at ¶155.)  They seek treble damages under the civil remedies provision the RICO Act, 18 U.S.C. § 1964(c) ("Section 1964(c)"), which provides in relevant part:

> Any person injured in his business or property by reason of a violation of [Section] 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

To state a claim under Section 1964(c), "a plaintiff must show (1) a violation of [Section] 1962, (2) an injury to his business or property, and (3) that his injury was proximately caused by the RICO violation." *Stooksbury v. Ross*, 528 Fed. App'x 547, 446 (6th Cir. 2013) (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268-69 (1992)).

Here, Plaintiffs do not allege in the Amended Complaint that they have suffered any injury to their "business or property" as a result of Defendants' alleged filing of the fraudulently-notarized Ownership and Delinquency Affidavits.  In Plaintiffs' response to the motion to dismiss, they attempt to save their RICO claims by asserting for the first time that the Defendants' conduct caused them to suffer financial losses in the form of litigation expenses and adverse "money judgments."

(ECF #23 at Pg. ID 567-68.)  But Plaintiffs did not plead in the Amended Complaint that they personally paid any court fees or attorney fees.  Nor did Plaintiffs plead that they personally had an adverse judgment entered against them.  Plaintiffs cannot cure deficiencies in their Amended Complaint through new allegations in their response to Defendants' motion to dismiss. *See, e.g.*, *Jocham v. Tuscola County*, 239 F. Supp. 2d 714, 732 (E.D. Mich. 2003) ("Plaintiffs may not amend their complaint through a response brief.")  Accordingly, Plaintiffs have failed to state a claim under Section 1964(c). *See Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 562 (6th Cir. 2013) (en banc) (affirming dismissal of plaintiffs' claim under Section 1964(c) because plaintiffs failed to allege that they "were injured in their business or property").[8]

## IV

For ease of reference, the Court has to this point treated the Defendants as a single group.  But Plaintiffs' fail to include allegations in the Amended Complaint that plausibly establish the liability of some of the listed Defendants.  Specifically, the Plaintiffs have failed to plead facts that, if proven, would establish the liability of Defendant Attorney Pettway.  Indeed, the Amended Complaint does not contain

---

[8] To the extent that Plaintiffs' claim under Section 1964(c) is based on anything other than Defendants' filling of fraudulently-notarized Ownership and Delinquency Affidavits, it is dismissed for lack of subject matter jurisdiction. (*See* Section II-C *supra*.)

any specific allegations about how Pettway's conduct injured Plaintiffs personally.[9]

Thus all claims against Pettway are dismissed.

In addition, Plaintiffs fail to plead allegations that plausibly establish the liability of Encore. Encore was not a party to Midland's collection suits against Plaintiffs, and Encore was not the employer of the Defendant Attorneys who filed Collection Complaints and fraudulently-notarized Ownership and Delinquency Affidavits.[10] And the Amended Complaint does not include any allegations about how Encore itself took any actions that injured Plaintiffs. Although both Midland and Asset Acceptance are subsidiaries of Encore, "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods et. al.*, 524 U.S. 51, 61 (1998) (internal quotation marks and citations omitted). There are exceptions to this general principle, but Plaintiffs neither plead in the

---

[9] Defendant Attorneys Pettway, Perry, and Smith are all listed on the front of the Newman and Ryan Collection Complaints, but only Perry and Smith signed those complaints. (*See* Newman and Ryan Collection Complaints, ECF #13-7.) The Amended Complaint does not include any allegations that Pettway affirmatively acted in any way that could plausibly establish her liability.

[10] The Amended Complaint makes a passing reference that Notary Peterson was "hired by *Encore* and Midland," (Am. Compl. at ¶71, ECF #13 at Pg. ID 218; emphasis added), but there is no specific allegation that Peterson was under the control of Encore or took any action on behalf of Encore.

Amended Complaint, nor argue in their briefs, that such exceptions should apply in this case. Accordingly, all claims against Encore are dismissed.

V

Finally, the Court declines to allow Plaintiffs to amend their complaint for a second time. The Federal Rules of Civil Procedure instruct that leave to amend should be "freely give[n] *when justice so requires*." Fed. Rule Civ. Proc. 15(a)(2) (emphasis added). But as explained below, justice does not require that Plaintiffs be permitted to file a Second Amended Complaint in this action.

During the October 24, 2016, hearing on Defendants' motion to dismiss, the Court listed for Plaintiffs' counsel many of the deficiencies in the Amended Complaint identified in this Opinion and Order and shared with Plaintiffs' counsel several concerns that the Court had regarding the manner in which Plaintiffs had pleaded their claims. For example, the Court raised the issue of Article III standing and questioned whether Newman and Ryan had personally suffered a concrete injury as a result of *each* of Defendants' collection practices that Plaintiffs sought to challenge. The Court also informed Plaintiffs that they had failed to plead allegations of "injury to business or property" necessary to establish statutory standing under the RICO Act. The Court even noted that the Amended Complaint did not include specific allegations regarding the separate liability of each Defendant.

At the end of the hearing, the Court determined that the best course of action was to give Plaintiffs the opportunity to file a Second Amended Complaint in which they could address the deficiencies and concerns that the Court had identified on the record. Plaintiffs agreed on the record to file a Second Amended Complaint within 21 days.

But during a November 2, 2016, telephonic status conference, Plaintiffs notified the Court that they had a change of heart. Even though the Court highlighted problems with their Amended Complaint and offered them a chance to cure those shortcomings, Plaintiffs told the court that they no longer wanted to file a Second Amended Complaint. The Court then informed Plaintiffs that if they declined the opportunity to amend at that time, the Court would be disinclined to allow a Second Amended Complaint after the Court ruled on Defendants' motion to dismiss. Plaintiffs then confirmed that they no longer wanted to file a Second Amended Complaint.

Given that (1) the Court offered Plaintiffs an opportunity to cure the deficiencies described above and (2) Plaintiffs declined that opportunity, justice does not require the Court to permit Plaintiffs to amend their Amended Complaint yet again after they have read this Opinion and Order. Plaintiffs are "not entitled to an advisory opinion from the Court informing them of the deficiencies of the [Amended] [C]omplaint and then an opportunity to cure those deficiencies." *Begala*

*v. PNC Bank, Ohio, Nat. Ass'n,* 214 F.3d 776, 784 (6th Cir. 2000) (quoting and affirming district court order denying leave to amend complaint). Thus, even though the Federal Rules of Civil Procedure embody a liberal policy in favor of permitting amendments, *see* Fed. Rule Civ. Proc. 15(a)(2), the Court declines to grant Plaintiffs leave to file a Second Amended Complaint.

## VI

For the reasons stated above, **IT IS HEREBY ORDERED** that:

- To the extent that Plaintiffs' claims in the Amended Complaint are based on anything other than Defendants' filing fraudulently-notarized Ownership and Delinquency Affidavits in state court**,** such claims are **DISMISSED** for lack of subject-matter jurisdiction.

- With respect to Plaintiffs' claims under 15 U.S.C. § 1692d, MCL § 445.252(b), MCL § 445.252(f), MCL § 445.252(n), and the RICO Act that are based on Defendants' filing of the fraudulently-notarized Ownership and Delinquency Affidavits in state court, Defendants' motion to dismiss these claims under Rule 12 (b)(6) is **GRANTED**. These claims are **DISMISSED WITH PREJUDICE**.

- In addition, Plaintiffs' claims against Defendant Attorney Pettway and against Encore are **DISMISSED WITH PREJUDICE.**

- The only claims remaining in this action are Plaintiffs' claims that Defendants (other than Pettway and Encore) violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692f, MCL § 445.252 (a), and MCL § 445.252 (e), by filing fraudulently-notarized Ownership and Delinquency Affidavits in state court. The action may proceed with respect to these claims.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: August 14, 2017

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 14, 2017, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764